FRUIT BOAT MARKET and another, Respondents, vs. INDUSTRIAL COMMISSION and another, Appellants.

*May 8—June 2, 1953.*

For the appellant Industrial Commission there was a brief by the *Attorney General* and *Mortimer Levitan,* assistant attorney general, and oral argument by *Mr. Levitan.*

For the appellant James R. Mooney there was a brief and oral argument by *George D. Young* of Milwaukee.

For the respondent there was a brief by *Quarles, Spence & Quarles,* attorneys, and *Kenneth P. Grubb* and *Norman C. Skogstad* of counsel, all of Milwaukee, and oral argument by *Mr. Skogstad.*

CURRIE, J.   The issue on this appeal is whether there is any credible evidence, which, if unexplained, would support the finding of the commission that at the time of Mooney's injury he was engaged in performing service growing out of and incidental to his employment. *Hills Dry Goods Co. v. Industrial Comm.* (1935), 217 Wis. 76, 85, 258 N. W. 336; and *Motor Transport Co. v. Public Service Comm.* (1953), 263 Wis. 31, 46, 56 N. W. (2d) 548.

Fruit Boat Market (hereinafter referred to as "Fruit Boat") is a Wisconsin corporation and operates an open-air retail fruit and vegetable market on a seasonal basis. The premises are leased from year to year from the Clark Oil Company, but Fruit Boat installed its own structures and equipment situated on the leased premises. Of the 100 issued shares of capital stock of Fruit Boat, Mooney and his wife jointly own 73 shares, and the remainder are owned by relatives.

Mooney is the president and general manager, and thus when engaged in the business of the corporation he was not under the directional control of any superior officer. In fact, the workmen's compensation insurance policy issued by the plaintiff insurance carrier upon Fruit Boat's employees described Mooney's duties as follows:

"James Richard Mooney, general manager, buyer, and president—operates fruit market—maintaining and managing, buying and selling, approximately 25 per cent to 50 per cent of time away from premises in conduct of administrative duties."

Although a large number of employees are employed during the business season, when cold weather comes in November the market is closed down and all employees but Mooney are laid off. The records and some office equipment are transferred from the market to the rented apartment, which Mooney and his wife occupy as their home, and the business of the corporation during winter months is transacted from the home. Such business consists of settling the season's accounts, negotiating contracts for the coming year, tending to business mail, etc. The auditor for the plaintiff insurance carrier even audits the pay-roll records at the home for purposes of determining the correct amount of premium to be paid on the workmen's compensation insurance. One compelling reason for moving the office from the market to the home during winter months is because there are no adequate facilities for heating the market premises.

Rather late in the day on January 18, 1949, Mooney by telephone arranged to meet a representative of the lessor of the market premises at 10 o'clock the next morning to negotiate a new lease. Mooney was concerned over Fruit Boat's right to remove the structures and fixtures installed by it, and tried to contact his own attorney by telephone without success. He then decided that he would go to the public library and see what he could find there with respect to the law of fixtures, and then proceeded to the market premises to pick up the old lease, which had been left in the files there and which he considered that he would need for the next day's conference. He also had an additional business reason for going to the library and that was to study the California newspapers with regard to weather conditions affecting the orange crop in Orange county, California. The reason why Mooney was particularly interested in the California weather situation was because if the orange groves had been adversely affected it would mean that the price of oranges would be higher during the summer of 1949. Fruit Boat's supplier of

mesh bags, on which Fruit Boat's name was imprinted, had made a mistake in Fruit Boat's order and was attempting to deliver an excess quantity. Mooney had concluded that he would accept the excess quantity if he could use them during the coming season for packaging cheap oranges to be sold by the bag. However, if the price of oranges was going to be high, because of adverse weather conditions in California, it was his conclusion that it would be inadvisable to accept the excess quantity of bags for customers will not readily buy bags of oranges if the price per bag is above a certain figure.

Mooney went from his home to the public library where he first studied the California weather reports in a California newspaper. Then he obtained the information he was seeking with respect to the law of fixtures between landlord and tenant. After that he became engrossed in a book dealing with the principles of marketing which he found of interest because of its application to the operation of outdoor markets, which occupied his time until the closing of the library at 9:30.

After leaving the library he crossed the street to a Walgreen drugstore and obtained a cup of coffee. Snow was falling and traffic conditions were very bad when he then boarded a streetcar to commence his trip to the market. It was necessary for him to make a transfer and because of the bad weather conditions the other streetcar he was to board did not come for some time. He then went into a tavern, near which he had been waiting for the streetcar, to use the telephone in an effort to call a taxicab, and while in the tavern purchased and drank one glass of beer. He did not procure a cab, but a streetcar finally came which he boarded and which took him to the vicinity of the market premises of Fruit Boat. He was in the process of alighting from the streetcar when he was struck by an automobile which caused the injuries resulting in his disability.

The fact that Mooney is the president and general manager of a family corporation in which he is the principal stockholder does not prevent an employer-employee relationship from existing between the corporation and himself. This court held under an almost identical fact situation in *Milwaukee Toy Co. v. Industrial Comm.* (1931), 203 Wis. 493, 234 N. W. 748, that the president, general manager, and principal stockholder of a family corporation is an employee of the corporation.

Sec. 102.03 (1) (c), Stats., provides in part as follows:

"Where, at the time of the injury, the employee is performing service growing out of and incidental to his employment. Every employee going to and from his employment in the ordinary and usual way, while on the premises of his employer, shall be deemed to be performing service growing out of and incidental to his employment; . . ."

The learned trial judge based his determination that Mooney at the time of injury was not "performing service growing out of and incidental to his employment" on the ground that he was injured on his way from his home to his place of employment (the market) before he had reached the premises of his employer. The trial court also found that Mooney's home on the date of the accident was not his place of employment but only Fruit Boat's market premises.

It is, of course, possible for an employer to have more than one place of employment, and a very plausible argument can be made that both the home and market place constituted places of employment for Mooney during the winter season. However, we find it unnecessary to determine whether the home was such place of employment because when Mooney left the home he was going to the public library on business for his employer. Can it be said that he was performing service growing out of and incidental to his employment while at the library, but that such service ceased upon leaving the

library and did not commence again until he entered upon the market premises?

Let us suppose that instead of going to the library Mooney had left his home to go to the bank where Fruit Boat Market kept its account in order to deposit checks or funds of the corporation intending to go from the bank to the market premises to pick up the copy of the lease. Under such facts we think it would be very clear under our decision in *Bitker Cloak & Suit Co. v. Industrial Comm.* (1942), 241 Wis. 653, 6 N. W. (2d) 664, that Mooney was performing services incidental to his employment during the entire trip. In that case the applicant was a saleslady at the Bitker store whose duties occasionally required her to call upon customers to make collections. On the day of her injury she was instructed to make a call before coming to work. She was injured while on that part of the route common to both the store and customer and before she arrived at the point where the route to the customer deviated from the route to the store. It was there held that when injured applicant was performing service growing out of and incidental to employment, and the opinion declared (p. 656):

"It is the rule in this state that an employee, whose duty it is to travel on behalf of an employer and to do work away from the premises of the employer and who is not required to report to the premises before starting out to do this outside work, is performing services as soon as he leaves his home and starts for the first place at which he is to perform such work. [Citing cases.]"

Professor Arthur Larson in 1 Law of Workmen's Compensation (1952), p. 222, sec. 16.00, states:

"The rule excluding off-premises injuries during the journey to and from work does not apply if the making of that journey, whether or not separately compensated for, is in itself a substantial part of the service for which the worker is employed."

Counsel for respondents contend that Mooney's trip to the library and his activities there were for his own benefit and not incidental to his employment by Fruit Boat. Mooney's testimony as to his purpose in going to the library, and what he did there, is undisputed, but the respondents quarrel with the inference drawn from that testimony by the commission. In *Gant v. Industrial Comm.* (1953), 263 Wis. 64, 69, 56 N. W. (2d) 525, it was stated:

"However, when facts are not in dispute but permit the drawing of different inferences therefrom, the drawing of one of such permissible inferences by the commission is an act of fact finding, and the inference so derived constitutes a finding of an ultimate fact and not a conclusion of law. *Hipke v. Industrial Comm.* (1952), 261 Wis. 226, 231, 52 N. W. (2d) 401; *Ebner v. Industrial Comm.* (1948), 252 Wis. 199, 201, 31 N. W. (2d) 172; *Green Valley Co-op. Dairy Co. v. Industrial Comm.* (1947), 250 Wis. 502, 505, 506, 27 N. W. (2d) 454."

The commission having found that the entire trip from Mooney's home to the library and from the library to the market and return "constituted service for the employer," such finding with respect to that which he did at the library must be upheld because the reading of the California weather report, the study of the law of fixtures, and the reading of the book on merchandising were all acts which would benefit Fruit Boat.

Respondents stress Mooney's acts of stopping in the drug-store for a cup of coffee and drinking one glass of beer at the tavern, as an incident to putting through a telephone call, as establishing that he was not engaged in an errand for his employer, Fruit Boat, but rather in activities for his own personal purposes. We do not think these two incidents were sufficient digressions to change what obviously was a business trip into one for personal pleasure. It seems inconceivable that Mooney would have left his home on a stormy and dis-

agreeable night to go down into the business district of Milwaukee for the purpose of drinking one cup of coffee and one glass of beer.

*By the Court.*—Judgment reversed and cause remanded with directions to confirm the order of the Industrial Commission.